**SECURITIES AND EXCHANGE COMMISSION, Appellant,**

**v.**

**Virgil A. KLUESNER, Appellee.**

**No. 87–5031.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 4, 1987.

Decided Dec. 15, 1987.

Rehearing and Rehearing En Banc Denied Feb. 19, 1988.

Michael D. Donovan, Washington, D.C., for appellant.

Robert Hennessey, Bloomington, Minn., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MAGILL, Circuit Judge.

LAY, Chief Judge.

The Securities and Exchange Commission (SEC) appeals the district court's[1] award of Kluesner's attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 (EAJA). For reversal, the SEC asserts: (1) that the district court's decision

---

1. The Honorable Donald D. Alsop, Chief United States District Judge for the District of Minnesota.

was an abuse of discretion and should be reviewed de novo; (2) that the district court erred in awarding attorney's fees because the SEC had substantial justification to bring suit; and (3) that the district court erred in awarding attorney's fees because of the existence of special circumstances.

Kluesner was president of Wordtronix, a start-up company involved in developing and marketing word processing systems. The company's stock was sold publicly in the local over-the-counter market. The SEC brought suit against both Kluesner and Wordtronix for violations of section 10(b) and rule 10b–5 based on two press releases issued by the company concerning certain sales arrangements Wordtronix made with two other companies. Wordtronix consented to a permanent injunction against further violations, but Kluesner maintained his innocence and proceeded to trial.

It is now well established that in order for the SEC to prove a section 10b–5 violation, it must show a misrepresentation or omission, which is material, and done in connection with the sale or purchase of a security. The SEC must also prove that the misrepresentation or omission was done with scienter. The press releases described certain multi-million dollar "sales agreements" between Wordtronix and two other companies, BMC and EMC. The SEC characterized these agreements as distributorship agreements rather than sales agreements and pointed to conditions which had to be met before any obligation arose. The SEC also claimed that BMC's failure to pay $10,000 placed it in default of the contract. Within 45 days of the press release, Wordtronix's stock had more than doubled in price to $7.50 per share. However, when the two deals fell through, the value of the stock dropped.

After a seven day trial to the court, Chief Judge Alsop held that there was no violation of either section 10(b) or rule 10b–5 by Kluesner. Specifically, the district court found: (1) that Kluesner had no intent to deceive, nor was he reckless in disseminating the press releases; (2) that Kluesner did not believe that the releases contained false or misleading information; and (3) that Kluesner should not reasonably have believed that the press releases were misleading. The district court set forth 32 detailed findings of fact which inter alia reflected the following:

31. Viewed in the light of subsequent events, Kluesner was overly optimistic about the significance of the BMC and EMC contracts. But he did not intentionally or recklessly disregard a substantial risk that the information contained in the press releases was false. Instead, Kluesner reasonably believed at the time of the releases that the information they contained was accurate. He also reasonably believed that the information omitted from the press releases was immaterial to the purposes for which the releases would be used by their recipients.

32. Kluesner did not form the belief that either the BMC or EMC press releases contained false or misleading information, or omitted information necessary to make them not misleading, nor should he reasonably have done so, at any time when traders in the market would reasonably rely on the press releases. Thus, Kluesner did not intentionally or recklessly fail to correct a misleading impression left by the press releases.

Slip op. at 7–8. The SEC did not appeal that decision. Kluesner then filed for and was awarded over $59,000 in attorney's fees under the EAJA.

The EAJA provides that "a court shall award to a prevailing party other than the United States fees and other expenses, * * * unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). The guidelines for review of such an award are clearly set forth in this circuit:

On appeal, the district court's decision on an application for fees under the EAJA is not to be disturbed unless it constitutes an abuse of discretion. Under this standard, the district court's conclusions of law are reviewable on a de

novo basis, and its findings of fact are reviewable under the clearly erroneous standard.

*Brouwers v. Bowen,* 823 F.2d 273, 275 (8th Cir.1987) (per curiam) (citations omitted).

### Substantial Justification for Suit

■ The government bears the burden of proving that its position is substantially justified. *Foley Constr. Co. v. U.S. Army Corps of Eng'rs,* 716 F.2d 1202, 1204 (8th Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984). The basic test has been described as a test of the reasonableness of the government's position. *Id.* However, after the 1985 amendments to the EAJA, this court has held "that the Government now must show not merely that its position was *marginally reasonable* [, but that] its position must be *clearly reasonable,* well founded in law and fact, solid though not necessarily correct." *United States v. 1,378.65 Acres of Land,* 794 F.2d 1313, 1318 (8th Cir.1986) (emphasis added and footnote omitted).

The government asserts that the primary issue at trial was whether Kluesner acted with scienter. However, the district court found that Kluesner acted with "reasonable belief" and did not recklessly or intentionally act to deceive others through the two press releases.

Significant here is the fact that the government does not challenge any of the district court's findings as clearly erroneous. It did not file an appeal on the merits and as such this court must accept Chief Judge Alsop's findings as not clearly erroneous. The district court construed these agreements as sales agreements. The court also found that the press releases did not mislead any investors. Based upon these detailed findings of fact we find no abuse of the district court's discretion in holding that the government's suit was not substantially justified under the EAJA.

### Special Circumstances

■ The government also asserts that special circumstances existed which support a denial of attorney's fees under the EAJA. As special circumstances, the government asserts changes in the testimony of Kluesner and Roy Zabierek at trial as compared to their statements made during the government's investigation.

The SEC asserts that Kluesner testified at trial that the BMC agreement was in fact a firm sale, whereas he had stated earlier that it was a dealer or quota arrangement. Kluesner responds by stating that the SEC is incorrect because Kluesner never used the words "firm sale," "firm contract" or "firm agreement" at trial. Kluesner said merely that a past due $10,000 payment from BMC was insignificant: "[c]ompared to the fact that 3,000 units were to be delivered over a three and a half year period, BMC being a large company, Serif units, 50,000 trading companies, that kind of thing." Joint Appendix at 892. This statement illustrates Kluesner's belief that the $10,000 was not material to the contract, and, thus, BMC's failure to pay that sum did not constitute either a breach of the contract or a failed condition precedent.

Roy Zabierek was a Wordtronix marketing executive. The SEC asserts that during its investigation Zabierek initially denied having anything to do with the BMC press release, but recanted that during trial. Kluesner responds that although that is technically correct, the SEC failed to mention that Zabierek first recanted his earlier statement when he was deposed, on May 10, 1984, some two years prior to trial. Thus, Kluesner asserts that there were no special circumstances such as to warrant disallowance of attorney's fees.

Based on these facts, the district court found that this asserted discrepancy did not constitute special circumstances. We hold that his finding of fact is not clearly erroneous and it was not an abuse of discretion to find no special circumstances under the EAJA.

We affirm the district court's findings that the SEC's action was not substantially justified and that special circumstances did not exist to make the award of the attorney's fees unjust.

Judgment affirmed.

FLOYD R. GIBSON, Senior Circuit Judge, dissenting.

I respectfully dissent from the majority opinion for several reasons. First, I believe that the majority places too much emphasis on the SEC's decision not to appeal the district court's order on the merits of the Section 10(b) and Rule 10b–5 claims. Second, I feel that the facts of this case, which will be elaborated on below, require a reversal of the attorney's fees award because the SEC's position before the district court was substantially justified. Finally, the special circumstances of this case would make an award of attorney's fees unjust.

## I. BACKGROUND

In order to fully understand the SEC's position it is important to explain the context in which Kluesner was acting when he released the BMC and EMC press releases. Wordtronix was founded by Kluesner and Frederick Zimmerman in early 1981. Kluesner was primarily responsible for raising operating capital. Shortly after Wordtronix's initial public offering in 1982, Kluesner approached several investment banking firms to obtain additional operating capital. Kluesner's efforts were unsuccessful because Wordtronix had only completed three prototypes of its word processors and did not record any profits or sales since its inception. It was suggested to Kluesner that if Wordtronix could demonstrate "marketing activities" it might be able to raise capital in the public markets. During this same time frame the BMC agreement was signed and the press release announcing this "sales" agreement was disseminated to the same people that Kluesner had previously approached for operating capital. The press release failed to disclose that BMC was not obligated under the agreement to buy any Wordtronix word processors other than four prototypes. In essence the BMC agreement was a distributorship agreement. Further, the agreement was conditioned on the development of mathematics software by Wordtronix. Wordtronix's stock price increased by more than 100% in just 30 trading days after the issuance of the BMC press release. Zimmerman, Wordtronix's co-founder, expressed serious reservations about the BMC release stating that the release "sounded like that if someone looked at the next three and a half years that Wordtronix was guaranteed $15 million in revenue from just one customer * * * * I felt [that] was not the case." Joint Appendix at 371–73.

In late April Wordtronix issued the EMC press release which also characterized the EMC agreement as a sales agreement. In addition, the EMC release restated the statements in the BMC release concerning the BMC agreement. Kluesner admits that at the time of the second release BMC was in default because it failed to meet one of the express conditions in its agreement with Wordtronix. The EMC release was sent to many of the same people who received the BMC release.

Shortly thereafter Wordtronix signed an investment banking commitment for a best efforts private placement of Wordtronix securities. This placement raised the capital that Wordtronix so desperately needed.

## II. DISCUSSION

The majority opinion places great emphasis on the SEC's decision not to appeal the district court's order on the merits of the Section 10(b) and Rule 10b–5 claim. The majority states, "[s]ignificant here is the fact that the government does not challenge any of the district court's findings as clearly erroneous. It did not file an appeal on the merits and as such this court must accept [the district court's] findings as not clearly erroneous." *Supra* at 1440.

This simply is incorrect. To follow the majority's reasoning, appellate review of an attorney's fees award when no appeal has been pursued in the merits phase would be limited to a determination of the correctness of the district court's conclusions of law. Thus, this court would merely rubberstamp the district court's findings of fact, because if we are bound by the district court's unappealed findings of fact in the merits phase then there would be no opportunity to review these findings in the context of the attorney's fees award. The "substantial justification" test requires a

determination of the reasonableness of the government's position. In order to make such a determination this court must make an independent review of *both* the district court's conclusions of law *and* findings of fact. Merely losing the case and deciding not to appeal is not an admission by the government that its position was unreasonable, as this court noted in *Keasler v. United States*, 766 F.2d 1227 (8th Cir.1985):

> In determining the reasonableness of the government's position, the legislative history of section 2412(d) is helpful. The House Judiciary Committee stated that the "reasonableness" standard "should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the Government to establish that its decision to litigate was based on a substantial probability of prevailing."

*Id.* at 1231 (quoting H.R.Rep. No. 1418, 96th Cong., 2d Sess., at 11, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4953, 4990); *Federal Election Com'n v. Rose*, 806 F.2d 1081, 1087 n. 13 (D.C.Cir.1986).

To require the government to appeal every case in the merits phase merely to establish its EAJA justification would unduly increase the burden both on private litigants and the government; and, thereby undermine the fundamental purposes of the EAJA.

Therefore, I believe that the government's decision not to appeal the district court's judgment on the merits in no way detracts from its justification in initiating the case. The government is obligated to evaluate an appeal independently from both a policy and an EAJA perspective.

Further, if this court is bound by the district court's findings of fact in every case where no appeal is taken, then an appeal of attorney's fees under the EAJA would become meaningless. "Only through a fresh look occasioned by application of the 'substantially justified' standard can the court honor Congress' intent, manifest in the inclusion of this standard, not to permit a prevailing party automatically to recover fees." *Federal Election Com'n v.*

*Rose*, 806 F.2d at 1087. We must make an independent evaluation through an EAJA perspective when determining whether the government's position was substantially justified.

## A. Substantial Justification

Although the decision of the district court on the merits of the Section 10(b) and Rule 10b–5 claim is not currently before the court, I believe that the district court erred in dismissing the action against Kluesner. It goes without saying that if the district court erred in dismissing the SEC's action and the SEC should have prevailed then the SEC was substantially justified in initiating the action. Therefore, I believe it is necessary to consider the district court's dismissal on the merits in determining whether the SEC was substantially justified. Further, the district court's Findings of Fact, Conclusions of Law and Order for Judgment on Kluesner's application for attorney's fees is so conclusory that we must look to the court's Findings of Fact and Conclusions of Law in the merits phase in order to determine the basis of the court's order.

In cases such as this it is especially important that the district court carefully and specifically state its findings of fact and conclusions of law. In the context of an EAJA application the court's findings of fact and conclusions of law serve a dual purpose. First, specific findings of the district court aid and facilitate appellate review. Second, specific findings are necessary to advise the litigants of the reasonableness of the positions taken before the district court. This is important in cases where the district court finds the government's position lacks substantial justification because it may prevent the government from taking such a position in the future, thus, advancing the goals of the EAJA.

Although the district court conducted a separate hearing concerning Kluesner's fee application, its decision awarding fees fails to discuss the basis for the award. The order simply holds that the SEC's position was not substantially justified and points

to no flaw in the legal theory advanced by the Commission or the facts supporting that theory.

Finally, it is important that the district court make specific findings of fact and conclusions of law on an EAJA application because these findings are to be made after the court has taken a "fresh look" at the case with an EAJA perspective. The danger this court risks in reviewing the findings made at the conclusion of the merits phase is that these findings do not reflect the district court's judgment from such a perspective.

The only element of the SEC's case that was seriously disputed was whether Kluesner acted with scienter in issuing the press releases. The district court's findings of fact in the merits phase state that "Kluesner's conduct amounted to neither an intentional nor a reckless misstatement or omission of material fact." Reviewing this finding of the district court under the clearly erroneous standard, I believe that it was erroneous.

The evidence before the district court on the issue of Kluesner's scienter establishes that, at a minimum, Kluesner was reckless in issuing the second press release. The press releases were factually flawed, were erroneous in fact and were purposely released to raise capital from prospective investors who would rely on the truthfulness and accuracy of the releases. The facts show that Wordtronix's co-founder expressed grave reservations concerning the impression created by the first press release. Additionally, the price of Wordtronix stock skyrocketed shortly after issuing the release. These facts as well as the other evidence presented at trial suggest that market participants relied on the press releases. The evidence also establishes that the first press release did not accurately reflect the true nature of the BMC agreement. Thus, to issue a second release restating the contents of the first release, as well as announcing a second "sales" agreement with EMC—an agreement that did not obligate EMC to purchase Wordtronix products—was, at a minimum reckless, if not intentional.

Once it is established that Kluesner was at least reckless in issuing the second press release, the question then becomes whether recklessness can establish the scienter requirement of a Section 10(b) and Rule 10b–5 violation. As the district court noted, this circuit has not ruled on this issue and there currently is a split of authority among the circuits which have. *See Harris v. Union Elec. Co.*, 787 F.2d 355, 369 n. 12 (8th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986) (noting that the prevailing approach in the courts of appeals is that recklessness satisfies the § 10(b) scienter requirement). However, it is neither necessary nor appropriate that this issue be decided in the context of this EAJA attorney's fees award case. The SEC need only show that its theory of scienter was a good faith extension of existing law in order to be substantially justified. *See Mattson v. Bowen*, 824 F.2d 655, 657 (8th Cir.1987) ("The clarity of the governing law is an important factor to consider in determining whether the government's position was substantially justified."). Because many circuits have adopted the theory the SEC urged before the district court, I believe the SEC's position was substantially justified. *See, e.g., Harris v. Union Elec. Co.*, 787 F.2d at 369 n. 12 (and authorities cited therein); *Woods v. Barnett Bank*, 765 F.2d 1004, 1010 (11th Cir.), *rehearing denied,* 772 F.2d 918 (1985).

## B. Special Circumstances

The majority opinion also fails to address the crux of the SEC's argument that special circumstances existed which would make an award of attorney's fees unjust. The EAJA expressly provides that an application for fees should be denied where "special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).

This "safety valve" [exception] helps to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts. It also gives the court discretion to deny awards

where equitable considerations dictate an award should not be made.

H.R.Rep. No. 1418, 96th Cong., 2d Sess. at 11, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4990. *See also Oguachuba v. I.N.S.*, 706 F.2d 93, 98 (2d Cir.1983).

As already discussed, this case is the very case to which the "special circumstances" provision was intended to apply. The SEC was advancing in good faith a novel and credible extension and interpretation of law on the scienter element of a § 10(b) violation. Awarding fees in such cases will likely chill the vigorous enforcement of the securities laws. And, in light of recent events vigorous enforcement by the SEC ought to be encouraged, not discouraged.

In addition, equitable considerations require a reversal of the attorney's fees award. During the SEC's preliminary investigation of Kluesner and Wordtronix, Kluesner testified that the BMC agreement was a dealer or quota arrangement whereas at trial Kluesner testified that "3,000 units were to be delivered over a three and a half year period," indicating that the BMC agreement was a firm sale. Joint Appendix at 892. The earlier testimony during the preliminary investigation weighed heavily in the SEC's decision to initiate this action. The majority opinion ignores the significance of Kluesner's testimony and the district court's finding that "Roy Zabierek, Director of Marketing at Wordtronix, and Kluesner believed that BMC's commitment to purchase 3,000 units and resell them was firm and attainable."

This changed testimony critically weakened the SEC's case on the element of scienter. If Kluesner had testified at trial, consistent with his prior testimony, that the BMC and EMC agreements were distributorship agreements and not sales agreements then this would have strengthened the SEC's case because it would establish that at the time the press releases were issued Kluesner knew that they contained misstatements of material fact.

The Commission pursued the case against Kluesner relying in part on Kluesner's statements in the early stages of

their investigation. The change of testimony that had a vital impact on the outcome of the trial compels a denial of Kluesner's attorney's fees. The SEC relied to its detriment on the prior testimony of Kluesner. *United States v. Fidelity & Casualty Co.*, 402 F.2d 893, 897 (4th Cir.1968) ("Equitable estoppel is a well-established concept invoked by courts to aid a party who, in good faith, has relied, to his detriment, upon the representations of another.") (footnote omitted). Equity requires a reversal of Kluesner's attorney's fees award.

### III. CONCLUSION

Because at least one permissible view of the evidence leads to the conclusion that the SEC has shown a reasonable basis in law and fact for its position, I would hold that the trial court abused its discretion in awarding attorney's fees under the EAJA. In addition, equity requires a reversal of the attorney's fees award. Kluesner's changed testimony is the type of special circumstance that would make an award of attorney's fees unjust.